AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

### for the

### Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT

6/25/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

6/25/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jm _____ DEPUTY

United States of America

v.

Marius Catalin Trica,
  aka "Marius Catalin Ion,"

Defendant(s)

Case No. 2:25-MJ-03898-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 17, 2023, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(1) | Use of Counterfeit Access Devices |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Jenae Combest-Smith, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone. Date: 06/25/2025 at 3:51 p.m.

*Judge's signature*

City and state:  Los Angeles, California

Hon. Michael B. Kaufman, U.S. Magistrate Judge
*Printed name and title*

AUSA: Max Shapiro (x7419)

## AFFIDAVIT

I, Jenae Combest-Smith, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Marius Catalin TRICA ("TRICA") (formerly known as Marius Catalin ION) for a violation of 18 U.S.C. § 1029(a)(1) (use of counterfeit access devices).

2.    This affidavit is also made in support of an application for a warrant to search: an Apple iPhone 16 Pro (IMEI 1: 350903439830317 and IMEI 2: 350903438334592) seized from TRICA (the "SUBJECT DEVICE"), which is currently in the custody of Customs and Border Protection ("CBP") in San Ysidro, California, as described in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 1028A (Aggravated Identity Theft), 18 U.S.C. § 1029(a)(1) (Use of Counterfeit Access Devices), 18 U.S.C. § 1029(a)(2) (Use of Unauthorized Access Devices), and 18 U.S.C. § 1344 (Bank Fraud) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since May 2022. To become an HSI Special Agent, I completed six months of training at the Federal Law Enforcement Training Center in Brunswick, Georgia.

6.    During my employment as an HSI Special Agent, I have participated in investigations related to narcotics smuggling, organized criminal activity, document fraud, sex trafficking, human smuggling, immigration, and other financial related crimes.  I have participated in various aspects of criminal investigations, including telephone records analysis, physical surveillance, search warrants, seizures of narcotics, electronics, documents, skimming devices, and reviewing evidence from those seizures.  I have also spoken to and interacted with many law enforcement agents who have prior knowledge and experience investigating immigration and financial related crimes and the methods used to commit those crimes.

7.    Prior to becoming a Special Agent with HSI, I was employed as an insurance fraud investigator for approximately 12 years in the private sector.  During my employment as an

insurance fraud investigator, I investigated fraudulent insurance claims and was responsible for reporting fraudulent claims to designated government and law enforcement agencies for further investigation and prosecution.

### III. SUMMARY OF PROBABLE CAUSE

8.    HSI Los Angeles, HSI Attaché Bucharest, Romanian Law Enforcement, New York Police Department ("NYPD"), New York Department of Investigation ("NY DOI"), and New York City Department of Social Service Human Resources Administration ("NYC DSS HRA") (hereinafter collectively referred to as "Investigators") are currently investigating a Romanian Transnational Criminal Organization ("TCO").  I am the assigned case agent and have been directly involved with the investigation for approximately two years.

9.    The investigation has revealed that members of this Romanian TCO operate various organized crime groups that engage in human smuggling, narcotics smuggling, money laundering, import and export violations, organized retail theft, gambling, prostitution, violence, credit-card skimming, and financial fraud schemes domestically and internationally.  Investigators have identified numerous members of this Romanian TCO, including a Romanian national identified as TRICA.

10.    Since at least June 2023, TRICA and co-conspirators have been importing fraudulent identification documents into the United States, utilizing those fraudulent identification documents to open United States bank accounts and mailboxes, importing skimming devices into the United States, installing

skimming devices onto point-of-sale ("POS") equipment and ATMs, and doing cash-outs from victims' Electronic Benefit Transfer ("EBT") cards.

## IV. STATEMENT OF PROBABLE CAUSE

11.  Based on my review of law enforcement reports, conversations with other law enforcement agents, my own knowledge of the investigation, and my training and experience, I am aware of the following:

**A.   Information about Romanian TCOs**

12.  Members of Romanian TCOs are trained to travel from Romania and Europe to the United States to defraud Americans, as well as United States government programs and banking systems. Members of Romanian TCOs often stay in the United States illegally for many years while they commit these crimes. Oftentimes, members travel back and forth from the United States, but re-enter and exit illegally to evade law enforcement.  Members are trained to import fraudulent identification documents to assist them with their crimes and launder money for the TCO with the goal to re-integrate it into the Romanian banking system and real estate.  Intelligence from Romanian law enforcement has been corroborated this information.

13.  Members of Romanian TCO fraud groups typically enter the United States either legally with a visa, if they have no criminal record and can pose as a legitimate tourist or businessperson, or through established immigrant-smuggling rings in Mexico and Canada otherwise.  Oftentimes the crew members maintain false identity documents, which they use if arrested to

4

make it harder to identify them.  Some maintain false passports so that they can abscond if granted bail and flee the country.

14.  Members of Romanian TCO fraud groups have various ways of handling the proceeds of their offenses.  Some is kept in cash for routine expenses.  Some is usually deposited into a local bank account to pay for items for which cash would raise suspicion, such as rental cars and housing.  The bulk, however, is sent abroad either to their co-conspirators or home countries.  This may be as simple as sending cash hidden among other items abroad through carriers such as DHL, or transfers through banks, Hawalas, Western Union, or similar services.  More recently, the trend has been to purchase cryptocurrencies for cash.

15.  Members of Romanian TCOs involved in fraud schemes must keep evidence of their schemes, such as contact information for their co-conspirators, lists of victim information and accounts used in the scheme, simply to keep the scheme going.  Much of this evidence is now stored on digital devices such as computers and smartphones.

16.  Generally, perpetrators of fraud and identity theft schemes maintain this evidence where is close at hand and safe, such as in their residences, automobiles, and, especially with smartphones, on their person.  For larger or more sophisticated frauds, participants often attempt to distance themselves from some of the incriminating evidence by renting public storage units or safety deposit boxes where they often keep the items they will not need immediate access to.

17. Members of Romanian TCOs must out of necessity communicate with one another. Commonly this is done by text, VOIP, email, telephone, or a specialty communication application, often an encrypted one such as WhatsApp, and most often by smartphone. Members of the conspiracy commonly carry their smartphones, which include the contact information for their co-conspirators, on or near their persons, such as in their cars or residences.

### B. Background of SNAP and EBT

18. The Supplemental Nutrition Assistance Program ("SNAP") is a federally funded program that helps low-income households purchase food to meet their nutritional needs. Although SNAP is a federally funded program, state agencies are responsible for administering the SNAP program within each state consistent with federal law.

19. Electronic Benefit Transfer ("EBT") is an electronic system that allows state welfare departments to issue benefits via a magnetically encoded payment card, also known as an "EBT card."

20. In California, one of these assistance programs is called "CalFresh" (formerly known as food stamps), which helps low-income households purchase food items to meet their nutritional needs. Another assistance program is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

21. Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply

online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

22.  In New York State, the State agency responsible for administering SNAP benefits is the Office of Temporary Disability and Assistance ("OTDA").  SNAP benefits in New York are similar to the CalFresh benefits in California in that clients can only purchase eligible food related items.  Cash benefits in New York are like the CalWORKs benefits in California in that clients receive cash benefits for eligible items.  Residents in New York that meet the criteria established by OTDA programs can similarly apply online for benefits at myBenefits.ny.gov.

23.  CalFresh, CalWORKs, and OTDA benefits are issued on EBT cards.  EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions.  Each EBT card has a unique PIN that the beneficiary recipient must enter when using the EBT card.

24.  EBT cards can only be used at authorized EBT retailers.  Authorized retailers must meet certain requirements to accept EBT cards.  For example, one of the requirements is to offer different varieties of food from staple food categories that must be stocked at any given time.  Another requirement is that an authorized retailer must apply for a Food and Nutrition Service ("FNS") permit to process EBT transactions.  FNS is an agency of the USDA which is responsible for administering the

nation's domestic nutrition assistance programs.  Once the FNS permit is approved, the authorized EBT retailer must then utilize specific equipment that will process EBT card transactions, also known as point-of-sale ("POS") equipment. The POS equipment must have a personal identification number ("PIN") pad as EBT cardholders need to be able to enter the PINs.  The POS equipment is programmed by a third-party to accept EBT cards.

25.  Benefits received through CalFresh, CalWORKS, and OTDA are typically disbursed to EBT cardholders during the early days of each month.  Those benefits are deposited directly into the account of the EBT cardholder.  The cardholder can the amount of money available in his or her account (a "balance inquiry") via telephone or a mobile application.  The cardholder can also ask an EBT authorized retailer to conduct a balance inquiry in-store via the retailer's POS system.

26.  EBT fraud is a nationwide problem, and various criminal organizations target the EBT system, stealing victims' benefits, by stealing victims' EBT card information through what is colloquially referred to as "skimming."

**C.    Background on Card Skimming Activity**

27.  Credit card skimming is the process of criminals stealing credit or debit card information by installing devices -- "skimmers" -- in real card readers.  Skimmers are often installed in ATMs, gas pumps, and grocery and convenience store POS terminals.  They are often undetectable to victims and untrained personnel.  Skimmers contain components to: (1)

capture the credit card data stored on magnetic strips; (2) record the data to a memory chip; (3) power the device with a battery; and (4) access to internal memory (like a USB) via a cable or wireless protocols such as Bluetooth. Additionally, skimmers are often accompanied by hidden cameras or keypad device overlays to capture the victims' PIN codes which themselves contain internal memory and battery components.

28. Individuals will then use a digital device, such as a smartphone or laptop, to download the credit card data stolen by a skimmer. The internal memory of the skimmer (i.e., a USB) is plugged into a digital device or data is captured via Bluetooth on a cellphone app and the stolen credit card data is then downloaded and stored onto the digital device. Individuals involved in skimming often use multiple digital devices.

29. Card data stolen by skimmers is often sold in darknet marketplaces or used by the skimming group to clone credit cards. Digital devices are used to access these marketplaces to buy and sell the stolen card data.

30. A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe. On a legitimate debit or credit card, the information coded on the card's magnetic stripe will match the information embossed on the front of the card. This information includes the account number, expiration date, and cardholder's name, among other information. Whereas on a cloned card, the information coded on the magnetic stripe will not match the information embossed on the front of

the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be coded with the EBT card information, but the card itself will still bear the information of the gift card or bear no information if it is a blank white plastic card.

31.  Once the stolen EBT card information is loaded on to a cloned card, it can be used to make fraudulent purchases at an EBT authorized retailer and/or ATM withdrawals.

32.  Individuals involved in skimming often make calls to the EBT hotline to do balance inquiries on EBT cards and attempt to change victims' PIN numbers associated with their EBT cards via digital devices.

> **D.    TRICA Committed EBT Fraud Using Unauthorized Access Devices on September 17, 2023**

33.  Between at least August 2023 and February 2024, bank surveillance footage captured TRICA and co-conspirators working both independently and together conducting cash withdrawals at ATMs throughout Los Angeles, CA, with EBT cards that belonged to victims residing in New York, with losses totaling approximately $105,000.

34.  Specifically, on September 17, 2023, between 9:01 pm and 9:26 pm, TRICA utilized cloned cards with EBT victims' account information to withdraw approximately $940 from thirteen different victims' accounts at a Citibank located at 5670 Wilshire Blvd., Los Angeles, CA 90001.  The following are details from those transactions:

| Date/Time | Amount | Bank | Address | Victim | Card # |
|---|---|---|---|---|---|
| 17-Sep-2023 21:01:14 | $60 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | T.S. | 0645 |
| 17-Sep-2023 21:02:18 | $80 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | L.H. | 1295 |
| 17-Sep-2023 21:03:12 | $60 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | S.G. | 6243 |
| 17-Sep-2023 21:04:03 | $80 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | M.G. | 1948 |
| 17-Sep-2023 21:04:49 | $80 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | J.M. | 8766 |
| 17-Sep-2023 21:05:33 | $80 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | D.A. | 1870 |
| 17-Sep-2023 21:06:12 | $80 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | L.F. | 1152 |
| 17-Sep-2023 21:06:57 | $80 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | M.R. | 7051 |
| 17-Sep-2023 21:08:11 | $80 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | R.C. | 2610 |
| 17-Sep-2023 21:08:55 | $80 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | W.M. | 7039 |
| 17-Sep-2023 21:24:48 | $60 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | J.H. | 5429 |
| 17-Sep-2023 21:25:34 | $60 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | T.A. | 1530 |
| 17-Sep-2023 21:26:44 | $60 | Citibank | 5670 Wilshire Blvd. Los Angeles, CA 90001 | J.M. | 5544 |
| **Total** | **$940** | | | | |

35.   The following are snapshots of TRICA from the Citibank surveillance footage from the evening of September 17, 2023, which I can confirm are TRICA based on a comparison of the bank

surveillance snapshots to photographs I have seen from law enforcement databases of TRICA throughout the investigation. The footage depicts TRICA withdrawing cash from different EBT cards in rapid succession, which based on my training and experience is consistent with individuals engaging in credit card skimming withdrawals:

 

**E.    TRICA Has Repeatedly Attempted to Enter the United States Illegally, Including on June 23, 2025**

36.    The investigation to date has revealed that TRICA likely unlawfully entered the United States multiple times at unknown time periods, most likely from Mexico.  Law enforcement databases showed TRICA only had an outbound travel history from the United States but no inbound travel history:

a.    In May 2018, TRICA departed the United States via an outbound flight from Miami, Florida;

b.    In December 2018, TRICA departed the United States via an outbound flight from New York;

c.    In January 2021, TRICA was encountered in the Dominican Republic with 29 credit card skimming devices;

d.    In February 2021, TRICA was found to be part of a group of 38 Romanian nationals that were in transit through El Salvador after being denied entry into Guatemala;

e.    In March 2021, TRICA and four other Romanian nationals were denied entry into Columbia; and

f.    In April 2022, TRICA departed Cancun, Mexico via an outbound flight.

37.  On June 23, 2025, I received information from Customs and Border Protection (CBP) that on June 22, 2025, at approximately 8:31 pm, TRICA attempted to enter the United States via Mexico in a Mexican ambulance under the name Alfonso Paul SANCHEZ PRIETO.[1]  On June 22, 2025, a Mexican ambulance approached the San Ysidro Port of Entry in California.  The driver of the ambulance who claimed to be a paramedic handed over two identification cards on behalf of the transported patient in the ambulance, a California driver's license bearing the name Alfonso Paul SANCHEZ PRIETO (03/21/1970) and a United States Passport card bearing the same name SANCHEZ PRIETO.  CBP Officer Campa asked the driver what the emergency was, and the driver said the patient, SANCHEZ PRIETO, had fallen from something but he was not sure what. Office Campa asked the driver if SANCHEZ PRIETO was awake, and the driver said no.  CBP officers noticed that the photos on the identification documents

---

[1] Investigators and my subsequent investigation have identified at least three fraudulent and fictitious identities directly attributable to TRICA.

did not match the physical appearance of the patient, SANCHEZ PRIETO, inside the ambulance. CBP officers also suspected that the blood on SANCHEZ PRIETO's face appeared to be fake. Additionally, there was an alert in law enforcement databases indicating the identification documents presented for SANCHEZ PRIETO had been reported lost/stolen. SANCHEZ PRIETO was transported to a United States-based ambulance and transported to a hospital inside the U.S. for medical evaluation. SANCHEZ PRIETO's medical evaluation results indicated there was no evidence of injury. Upon release from the hospital, SANCHEZ PRIETO was returned to CBP officers pending an admissibility inspection and custody determination.

38.  Per CBP officers, TRICA (aka SANCHEZ PRIETO) was traveling with the SUBJECT DEVICE. TRICA did not provide the passcode to CBP officers, but unlocked the SUBJECT DEVICE for CBP officers who then used their border search authority to search the SUBJECT DEVICE. CBP officers located screen shots of WhatsApp chats discussing being smuggled into an unknown location and that the cost was approximately $8,000. CBP officers also located pictures of TRICA's true Romanian passport in the SUBJECT DEVICE.

39.  Based on my training and experience, I know that it is common practice for members of Romanian TCOs and other illegal aliens engaged in criminal activity to enter the United States illegally or under false pretenses through Canada or Mexico in order to evade law enforcement. I believe that TRICA attempted

to enter the United States illegally under false pretenses so he could continue to commit various crimes in the United States.

**F.    TRICA was Denied Visa Applications**

40.   Per law enforcement databases, TRICA attempted to obtain B1/B2 visas in September 2016 and January 2017; however, his applications were denied due to his suspected criminal history and questionable stories provided to the government for his visa applications.

**V.    <u>TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES</u>**

41.   Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.    It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes;

(5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.    Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

c.    It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

d.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such schemes can also often be found on digital devices, such as computers.

e.    Based on my training and experience, I know that
individuals who participate in identity theft, bank fraud, and
access device fraud schemes often have co-conspirators, and
often maintain telephone numbers, email addresses, and other
contact information and communications involving their co-
conspirators in order to conduct their business.  Oftentimes,
they do so on their digital devices.  Suspects often use their
digital devices to communicate with co-conspirators by phone,
text, email, and social media, including sending photos.
Suspects may also have paper copies of such records, which they
may keep on their person or in their cars, homes, or storage
units.

f.    Individuals engaged in mail and identity theft
often use multiple digital devices, which they may keep on their
person or in their cars or homes.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

42.  As used herein, the term "digital device" includes the
SUBJECT DEVICE.

43.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the

hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

44.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it can take a substantial period of time to search a
digital device for many reasons, including the following:

a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

45.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.  Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally

displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress TRICA's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of TRICA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

46.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

47.    For all of the reasons described above, there is probable cause to believe that TRICA has committed a violation of 18 U.S.C. § 1029(a)(1) (use of counterfeit access devices). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 25th day of
June, 2025 at 3:51 p.m.

_____
THE HONORABLE MICHAEL B. KAUFMAN
UNITED STATES MAGISTRATE JUDGE

21